1997 ME 132

**Frederick VILLAR**

v.

**Peter KERNAN.**

Supreme Judicial Court of Maine.

Argued May 6, 1997.

Decided June 11, 1997.

Ralph A. Dyer (orally), Law Offices of Ralph A. Dyer, P.A., Portland, for plaintiff.

Gerald F. Petrucelli (orally), John A. Anderson, Petrucelli & Martin, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

DANA, Justice.

[¶ 1] Pursuant to 4 M.R.S.A. § 57 (1989) and M.R.Civ.P. 76B, the United States District Court for the District of Maine (Hornby,

J.) has certified the following questions of state law to this Court:

(1) Does Maine law, including but not limited to 13–A M.R.S.A. § 618, preclude an action for breach of an oral contract between two shareholders of a closely held corporation prohibiting their receipt of salaries from the corporation?

(2) If the answer to the first question is "no," what factors are to be considered in determining whether specific performance is available to take an oral contract outside the statute of frauds provision, 33 M.R.S.A. § 51(5), for contracts not to be performed within one year?

[¶ 2] Pursuant to M.R.Civ.P. 76B(b), the United States District Court has prepared a statement of findings of facts. These facts disclose that in 1988 Frederick Villar and Peter Kernan agreed to go into the brick oven pizza business. Villar was responsible for operating the new business and Kernan assumed responsibility for the business's finances. When Villar and Kernan incorporated their business as Ricetta's, Inc., Villar received 49 percent of the shares and Kernan received 51 percent. According to Kernan, the parties agreed that "there would never be salaries. In other words, as owners [they] would never get salaries, just distribution." At some point Ronald Stephan, the manager of the restaurant, became a two percent shareholder of Ricetta's, Inc., obtaining one percent from both Kernan and Villar.

[¶ 3] The parties' pizza restaurant succeeded as a business but their relationship deteriorated. Villar and Stephan attempted to buy Kernan out, but the buyout was unsuccessful and ultimately Stephan became allied with Kernan.

[¶ 4] In March 1994 Kernan entered into a "so-called consulting agreement" with Ricetta's. The agreement provided for automatic payments to him of $2,000 per week. The agreement was ratified at a shareholders' and board of directors' meeting at which Villar was not present. Kernan's obligations pursuant to the agreement were not specified, but the corporation's rights were restricted. For example, Kernan's compensation could be increased but not decreased by a majority vote of the board of directors, and his services could be terminated only for criminal violation involving dishonesty, fraud, breach of trust, or for willful engagement in misconduct in the performance of his duties. Pursuant to the agreement Kernan received $90,000 in consulting fees in 1994 and $24,000 in early 1995.

[¶ 5] In May 1995 Villar filed a complaint in the United States District Court asserting six counts against four defendants. On Kernan's motion for a judgment on the pleadings or for a summary judgment, the court dismissed all of Villar's claims except the breach of contract claim against Kernan. A nonjury trial on Villar's breach of contract claim was held in August 1996. The court concluded that there was an oral agreement between Villar and Kernan that prohibited Kernan from receiving a salary from Ricetta's. The court determined that unless 13–A M.R.S.A. § 618 (1981)[1] precluded the enforcement of

1. 13–A M.R.S.A. § 618 provides:

**Agreements among shareholders respecting management of corporation and relations of shareholders**

1. No written agreement, whether contained in the articles of incorporation or by-laws or in a written side agreement, and which relates to any phase of the affairs of the corporation, including, but not limited to, the following:

A. Management of the business of the corporation; or

B. Declaration and payment of dividends or division of profits; or

C. Who shall be officers or directors, or both, of the corporation; or

D. Voting requirements, including requirements for unanimous voting of shareholders or directors; or

E. Employment of shareholders by the corporation; or

F. Arbitration of issues as to which the stockholders are deadlocked in voting power or as to which the directors are deadlocked and the shareholders are unable to break the deadlock; or

G. Which purports to treat the affairs of the corporation as if it were a partnership and the shareholders as if they were partners,

shall be deemed invalid because the agreement contains any such provision, or because it limits or restricts the powers or discretion of the directors of the corporation, or because it transfers to one or more shareholders or to one or more persons or corporations to be selected by him or them all or part of the management of the corporation, if the following conditions are satisfied:

an oral shareholder agreement, the agreement could be enforceable in equity despite the statute of frauds. Finding no controlling precedent in Maine regarding section 618 or the factors the court should consider when determining whether enforcement of an oral agreement within the statute of frauds is appropriate, the court certified the two questions. Our exercise of jurisdiction in this case is proper because there are no clear controlling precedents and our answer will, in one alternative, be determinative of the case. *See Dasha v. Maine Medical Ctr.*, 665 A.2d 993, 995 (Me.1995). We answer the first question in the affirmative and, therefore, do not address the second question.

■■■■ [¶ 6] When the language of a statute is clear and unambiguous, we will give the statute its plain meaning. *Stanley v. Tilcon Maine, Inc.*, 541 A.2d 951, 952 (Me.

1988) (citation omitted). We also consider the " 'whole statutory scheme of which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved.' " *Jordan v. Sears, Roebuck & Co.*, 651 A.2d 358, 360 (Me.1994) (quoting *Davis v. Scott Paper Co.*, 507 A.2d 581, 583 (Me.1986)). The fundamental rule in the interpretation of a statute is that the intent of the Legislature, as defined from the statute's language, controls. *State v. Butt*, 656 A.2d 1225, 1227 (Me.1995) (citation omitted).

■■ [¶ 7] Section 618 operates to validate agreements that would be unenforceable under traditional notions of acceptable corporate practice.[2] In short, the statute provides that written agreements between shareholders are enforceable even if they (1) relate to a phase of affairs of the corporation, such as

A. Either the agreement is set forth, or its existence is clearly referred to, in the articles of incorporation, and if in an amendment of the articles, such amendment was adopted by the unanimous vote of all outstanding shares, whether or not entitled to vote by the provisions of the articles; or the agreement has been expressly assented to in writing by all shareholders of the corporation, whether or not entitled to vote; and

B. Subsequent to the making of the agreement or its adoption in the articles or by-laws, shares are transferred or issued only to persons who have notice or actual knowledge thereof, or assent in writing thereto.

2. Notwithstanding a failure to satisfy the conditions set out in subsection 1, paragraphs A and B, such an agreement shall be valid and enforceable between the parties thereto, and their assignees and successors who have notice thereof, unless it is affirmatively shown that its enforcement would be prejudicial to the rights of third parties who intervene in objection to its enforcement.

3. To the extent that it contains provisions which would not be valid but for subsection 1, an agreement authorized by subsection 1 shall be valid only so long as no shares of the corporation are traded on any national securities exchange or regularly quoted in any over-the-counter market by one or more members of a national or affiliated securities association.

4. The text of any agreement authorized by subsection 1 shall be set forth in full, or a conspicuous reference shall be made to the agreement, upon the face or back of each certificate for shares issued by the corporation.

5. A transferee of shares in a corporation whose shareholders have entered into an agreement authorized by subsection 1 shall be deemed to have notice thereof if the text of the agreement was set forth, or if the agreement was conspicuously noted, on the face or back of the certificate for such shares when he took them.

6. The effect of an agreement authorized by subsection 1 shall be to relieve the director or directors of, and to impose upon the shareholders consenting to the agreement, the liability for managerial acts or omissions that is imposed by law upon directors to the extent that and so long as the discretion or powers of the directors in their management of corporate affairs is controlled by any such provision.

2. There is little legislative history regarding section 618. James Zimpritch's treatise, *Maine Corporation Law and Practice* (1993) (hereinafter Zimpritch at ——) provides some useful background information. Section 618 was enacted at a time when shareholder agreements were viewed by courts as unenforceable infringements on traditional corporate structure and control. Zimpritch at 184–85. *See, e.g., Ulmer v. Lime Rock R.R.*, 98 Me. 579, 594, 57 A. 1001 (1904) (shareholders do not control corporation's property; control of corporation is vested in officers and directors pursuant to articles of incorporation). Other states were also enacting laws that ensured such agreements would be enforced by the courts. Zimpritch at 184–85 and note 175. *See also* Model Business Corporation Act § 7.32, 2 *Model Business Corporation Act Annotated* 7–245 (1996) ("In the past, various types of shareholder agreements were invalidated by courts for a variety of reasons.... Rather than relying on further uncertain and sporadic development of the law in the courts, [the validation provision of] section 7.32 ... adds an important element of predictability....").

the management of the corporation, payment of dividends, or employment of shareholders, (2) restrict director discretion, or (3) transfer management duties to shareholders, as long as such agreements satisfy certain conditions. 13–A M.R.S.A. § 618(1). Specifically, the agreement must be included in the articles of incorporation or expressly assented to by all shareholders, and after the agreement is made anyone who acquires shares must have notice or actual knowledge of the agreement. § 618(1)(A),(B). Even if those specific requirements are not met, however, the agreement may still be enforceable between the parties to the agreement if the rights of any third parties who intervene and object to the enforcement of the agreement are not prejudiced. § 618(2).

[¶ 8] Kernan contends that the language in the first sentence of section 618(1) implies that shareholder agreements validated by section 618 must be in writing. We agree. Because the language of subsection (1) refers to written agreements between shareholders, stating that "[n]o written agreement will be invalid ... ", it is logical to conclude that the Legislature intended to validate only written agreements that meet the requirements of the statute. To conclude otherwise would nullify the word "written" in the opening sentence of that subsection.

[¶ 9] Villar argues that the parties' agreement is simply an agreement between shareholders that does not affect the corporation and that it need not rely on section 618's validation provision for its validity. We disagree. Their agreement affects the corporation's affairs because it effectively prohibits the corporation from hiring Kernan as a consultant. We are not persuaded by Villar's characterization of the agreement, asserted at oral argument, as one that would allow the corporation to hire Kernan but then require him to pay Villar half of the salary that he received from the corporation. Such an interpretation would effectively rewrite the parties' agreement.

[¶ 10] Kernan contends that the agreement at issue falls within the reach of section 618's validation provision because it relates to the affairs of the corporation by affecting the employment of shareholders. We agree. The potential scope of the validation provision of section 618 is broad. It states that an agreement is not invalid because it "relates to any phase of affairs of the corporation, including, but not limited to ... [e]mployment of shareholders by the corporation...." § 618(1)(E). The agreement between Villar and Kernan relates to the corporation's affairs because it prohibits Kernan from receiving a salary and effectively precludes his employment by the corporation. In addition, the agreement may affect the declaration and payment of dividends because money that is not distributed to Kernan in a salary may be distributed as dividends among the three shareholders. § 618(1)(B). Because the agreement must rely on section 618 for its validity and falls within the validating provision of section 618(1), it must meet the section's specifications and therefore must be in writing to be enforceable.[3]

[¶ 11] Subsection (2) of section 618 does not allow enforcement of the agreement at issue here because that subsection does not excuse the requirement in subsection (1) that the agreement be in writing to be validated. Subsection (2) provides that "[n]otwithstanding a failure to satisfy the conditions set out in subsection 1, paragraphs A and B, such an agreement shall be valid and enforceable between the parties thereto ... unless it is affirmatively shown that its enforcement would be prejudicial to the rights of third parties...." Although subsection (2) reflects an intent to allow enforcement of

---

3. We do not interpret section 618 to provide only a safe harbor for certain agreements that would be invalid pursuant to other provisions of the Maine Business Corporation Act or the common law. Rather, we conclude that an agreement that affects the corporation in a way addressed by section 618(1) must meet the specifications of 618 to be valid, and we need not first determine whether the agreement would be invalid pursuant to the Act or the common law. *But cf. 2*

*Model Business Corporation Act Annotated* 7–246 (1996) (The validation provision in the Model Act validates the types of agreements listed in that provision, but "the enumeration of these types of agreements is not exclusive; nor should it give rise to a negative inference that an agreement of a type that is or might be embraced by one of the categories ... is, ipso facto, a type of agreement that is not valid unless it complies with [that] section....").

shareholder agreements despite their failure to comply with the formalities of subsection (1), the language of the subsection does not excuse the writing requirement specified in the first sentence of that subsection. Thus, only written agreements that fail to meet the requirements of subsection (1) may be enforceable among the parties to the agreement by virtue of subsection (2).

[¶ 12] Because we conclude that to be enforceable section 618 requires a shareholder agreement prohibiting the shareholders' receipt of salaries from the corporation to be in writing, we answer the first certified question in the affirmative and do not answer the second question.